UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

S.C.,

Plaintiff,

v.

SOCIAL SECURITY ADMINISTRATION COMMISSIONER,

Defendant.

Case No. 25-cv-08131-LJC

**AMENDED ORDER RESOLVING SOCIAL SECURITY APPEAL**

Re: Dkt. Nos. 12, 14, 15

Plaintiff S.C.[1] challenges the final decision of the Commissioner of Social Security (Commissioner) denying her application for supplemental security income (SSI) benefits under Title II of the Social Security Act. *See* ECF No. 1 (Compl.). S.C. and the Commissioner consented to magistrate judge jurisdiction, ECF Nos. 4 and 9, and have filed their competing briefs on the merits in accordance with the Federal Rules of Civil Procedure's Supplemental Rules for Social Security Actions Under 42 U.S.C. § 405(g). ECF Nos. 12, 14, and 15. S.C. moves to reverse the Commissioner's decision and award her benefits or, in the alternative, remand the matter for further proceedings in front of the Administrative Law Judge (ALJ). ECF No. 12 at 28.[2] The Commissioner moves for summary judgment and for affirmation of the ALJ's final decision. ECF No. 14 at 5. Having considered the parties' briefing and, for the reasons discussed below, the Court finds in favor of S.C. and remands the matter for further proceedings.

[1] Because opinions by the Court are more widely available than other filings, and this Order contains potentially sensitive medical information, this Order refers to the plaintiff only by her initials. This Order does not alter the degree of public access to other filings in this action provided by Rule 5.2(c) of the Federal Rules of Civil Procedure and Civil Local Rule 5-1(c)(5)(B)(i).

[2] This Order cites the administrative record using the continuous page numbers applied by the Commissioner. This Order cites all other documents filed on the docket by page numbers assigned by the Court's ECF filing system, unless otherwise indicated.

United States District Court
Northern District of California

United States District Court
Northern District of California

## I. BACKGROUND

This background is not intended to summarize fully the administrative record, nor does it summarize all relevant medical or psychological evidence. Rather, this is a summary of the facts pertinent to the ALJ's decision, the briefs in this matter, and this Court's analysis.

### A. Procedural History

S.C. completed her SSI application on January 3, 2022, claiming a disability onset date of January 1, 2008[3]. AR at 56. S.C.'s application for benefits was denied initially on June 22, 2022, and reconsideration was denied on September 14, 2023. *Id.* at 167–78; 180–200, 210. She then requested a hearing in front of an ALJ. *See id.* at 218. ALJ Debra Underwood presided over the administrative hearing on July 18, 2024. *Id.* at 127. S.C., who was represented by counsel, testified about her personal history, medical conditions, and physical and mental limitations. *See id.* at 127–166. Following the hearing, on October 15, 2024, the ALJ denied S.C.'s application. *Id.* at 56–70. S.C.'s subsequent request for review was denied, *id.* at 1–7. S.C. filed this action on September 24, 2025, claiming the ALJ erred in her finding that S.C.'s seizure disorder and asthma are not severe impairments, erroneously discounted S.C.'s descriptions of their severity, did not base her assessment of S.C.'s mental functioning to perform work on substantial evidence, and improperly rejected the medical opinion of Dr. Kathleen Wiebe, PsyD. *See generally* ECF No. 12.

### B. Medical History

Among other conditions, S.C. suffers from depression, anxiety, seizure disorder, asthma, trauma history and interpersonal and cognitive functioning symptoms. AR at 1389. S.C.'s medical records indicate a history of grand mal seizures beginning in 1986 after a motor vehicle accident. *Id.* at 1385. A mental evaluation by Megan Stafford diagnosed S.C. with unspecified anxiety disorder. *Id.* at 1043–47. Medical records further indicated treatment history for: unspecified depression, and major depressive disorder; and a mood disorder; and symptoms including insomnia, nightmares, hypervigilance, avoidance, and anxiety attacks. *Id.* at 1385. S.C. has also been treated with medications for breathing asthma, epilepsy, depression and anxiety. *Id.*

---

[3] The ALJ determined, and S.C. did not challenge, that the protective filing date of January 3, 2022 would be the onset date. AR at 56.

United States District Court
Northern District of California

**1. Seizure Disorder**

S.C. experiences grand mal seizures at least once per year, which involves symptoms of shaking, loss of consciousness, biting her tongue, and urinary incontinence. *Id.* at 521, 1044. On July 27, 2021, Dr. Monish Ullal, M.D. noted S.C.'s "severe seizure disorder after motor vehicle accident at age 14 with traumatic brain injury." *Id.* at 503, 520, 523–24. Dr. Ullal concluded that S.C.'s medical condition prevented her from working and that the condition has persisted for more than 12 months. *Id.* at 503. Dr. Ullal also recorded that S.C.'s last seizure occurred six to seven months prior to the July 27, 2021 examination (approximately December 2020 or January 2021), that they occur a few times per year, and are exacerbated under stressors, such as the death anniversaries of family members, including S.C.'s child, mother, and brother. *Id.* at 521, 1151.

Other medical professionals have documented S.C.'s seizure disorder, including, frequency, symptoms, and triggers. See, e.g., *id.* at 518, 526–27, 531, 536–37, 546, 550, 553, 558, and 562. S.C. reported to Dr. Muralidhara at a September 15, 2021 visit that her last seizure occurred in April 2021 and that she had not taken seizure medication since approximately 2015, because the medication she was previously prescribed did not work, though she did not recall the name of the medication; Dr. Muralidhara started S.C. on Gabapentin. *Id.* at 517. Furthermore, on January 25, 2024, S.C. reported to Dr. Hiawatha Harris, M.D. that her last seizure was five months prior (approximately September 2023). *Id.* at 90.

Other sources, too, corroborate S.C.'s seizure testimony. For example, a Disability Determination Explanation dated June 6, 2023 noted in its "Findings of Fact and Analysis of Evidence" that S.C. had experienced a seizure one month prior (approximately May 2023). Furthermore, a May 16, 2023 third party function report by Perkita Reed reported that S.C.'s seizures wake her up while sleeping. *Id.* at 404. Reed is a long-time friend of S.C.'s who occasionally takes S.C. to her doctor's appointments and grocery shopping. *Id.* at 403.

**2. Asthma**

S.C.'s asthma is also documented in the record. *See* ECF No. 12 at 13. On May 9, 2023, the California Department of Social Services notified S.C. that "more information [was] needed about [her] asthma." AR at 415. In response, S.C. reported on a May 16, 2023 asthma

questionnaire that she experienced wheezing or breathing problems daily, took daily albuterol sulfate for treatment as prescribed, and that it was helpful in treating her asthma. *Id.* at 416. S.C. further reported that, in the past year, she had not received emergency room treatment, had not been hospitalized for more than forty-eight hours, and had not received a breathing test/pulmonary function test (PFT)/spirometry due to her asthma. *Id.* at 417. S.C. reported that her asthma prevents her from walking, explaining that she has difficulty with stairs and needs to stop and rest for 2–3 minutes after walking 2–3 blocks. *Id.* at 417, 427. At the July 18, 2024 hearing, S.C. testified that she went through three inhalers over the prior two or three weeks due to her asthma. *Id.* at 150. S.C. further testified that panic attacks and going up the stairs trigger her asthma. *Id.* at 151.

In her third-party function report, Ms. Reed noted that S.C. can only walk for 5–10 minutes before needing to rest for five minutes before she can resume walking. *Id.* at 401–10. Based on Ms. Reed's statement, assuming S.C. needs a five-minute rest break for every ten minutes of walking, this would mean that, over the course of an eight-hour workday in a job requiring walking, S.C. would need to rest for two hours and forty minutes each day; S.C. would only be able to walk for five hours and twenty minutes out of the eight-hour workday.

**3. Dr. Wiebe's Psychological Evaluation**

Dr. Kathleen Wiebe, Psy.D, provided a psychological evaluation of S.C, which the ALJ disregarded as "unpersuasive." *Id.* at 67. Dr. Wiebe diagnosed S.C. with "unspecified affective disorder; unspecified anxiety disorder; PTSD; borderline personality disorder with depressive, negativistic, paranoid, and sadistic personality traits and features; unspecified neurocognitive disorder; alcohol use disorder, on naltrexone; and rule-out cannabis use disorder." *Id.*

Specifically, Dr. Wiebe opined that S.C. has: "moderate limitations" in "understanding, remembering, and carrying out very short and simple instructions, maintaining attention and concentration for 2-hour segments, and performing at a consistent pace without an unreasonable number and length of rest periods"; "moderate-to-marked limitations" in "accepting instructions and responding appropriately to criticism from supervisors, completing a normal workday and workweek without interruptions from psychological based symptoms, and maintaining attendance

and being punctual within customary, usually strict tolerances"; and "marked limitations" in "understanding, remembering, and carrying out detailed instructions, getting along and working with others without excessive irritability, sensitivity, argumentativeness, or suspiciousness, interacting appropriately with the general public, and responding appropriately to changes in a routine work setting and dealing with normal work stressors." *Id.* Dr. Wiebe noted that S.C. was guarded, but also cooperative and responsive in her attitude towards the assessment. *Id.*

The ALJ disregarded Dr. Wiebe's opinion because she "performed the evaluation over the telephone and her opinion appears to be largely based on the claimant's subjective reports at the evaluation." *Id.* The ALJ concluded that the "marked limitations found by Dr. Wiebe are also not supported by testing results showing overall mild impairment in the domain of attention and concentration," and were "inconsistent with the record as a whole, including [S.C.'s] mental health treatment records which show fairly stable mental health symptoms, with exacerbations during the months of multiple anniversaries of her child and other family members, largely normal mental status exam findings, and overall mild to moderate limitations in functioning." *Id.*

### C. Hearing Testimony

The ALJ held an administrative hearing on July 18, 2024 where S.C., represented by counsel, had the opportunity to testify. *Id.* at 127. S.C.'s counsel was given the opportunity to ask S.C. questions. The ALJ and S.C.'s counsel also asked vocational expert Heidi Paul questions.

#### 1. S.C.'s Testimony

During the administrative hearing, S.C. testified about her home situation and current limitations due to her alleged conditions. She testified that she provides care for her disabled daughter, who suffers from ADHD and a severe mood disorder. *Id.* at 135. She explained that she cooks for her daughter, gets her ready for bed, gives her baths, and makes sure she takes her medicine. *Id.* at 136. She also testified she has not been employed in the last five years. *Id.*

When asked what keeps her from working now, S.C. testified that she does not like to be around a lot of people and feels more secure in her house. *Id.* The ALJ then asked about a neurologist appointment in 2021 where S.C. underwent an MRI and was referred to psychiatry, five months after a seizure. *Id.* at 138. S.C. testified she did not see anyone after that referral

because she was busy taking care of her daughter. *Id.* S.C. further testified that she is distrustful of medical providers after a group home therapist betrayed her trust by divulging to her mother that her stepfather was molesting her. *Id.* at 152.

Next, the ALJ asked S.C. about her medications. When the ALJ asked how long S.C. had been taking medications for her mental health, S.C. testified that she had been taking it since March of that year. *Id.* at 141. S.C. testified she takes Lexapro, Naltrexone, and Gabapentin, and Elavil when she cannot sleep. *Id.* S.C. testified she does not drink alcohol, and that the last time she did was in November 2023 after her apartment caught on fire, causing S.C. and her daughter to become homeless. *Id.* at 143. S.C. testified that, prior to that, she had been sober for almost three years following a fatty liver diagnosis. *Id.* at 144.

S.C. testified about the limitations on her life by her medical and psychological conditions. When asked about how her anxiety affects her daily life, S.C. testified that “it comes and goes” and she “can’t drive because of it.” *Id.* at 145. S.C. testified she gets physical anxiety symptoms, including feeling hot, tense, and sweaty about five times a month and they last a couple of hours. *Id.* at 146. When the ALJ asked S.C. about the last time she had a seizure, S.C. first responded that it had been a year or two ago but quickly clarified that she did not know. *Id.* at 147. S.C. testified she takes Gabapentin as anti-seizure medication. *Id.* When asked what would happen if she tried to get a job now, S.C. testified that she did not think she could function around people outside of her home. *Id.* S.C. explained she spent her days sitting down, watching TV, staying in her room, and cooking, that her sister takes her grocery shopping once a month, and that she does laundry once a month. *Id.* S.C also testified that her asthma is triggered by panic attacks and going up the stairs. *Id.* S.C. testified that she starts choking and coughing if she goes outside and that she also experiences these symptoms in her sleep—causing her to wake up in need of her inhaler. *Id.* S.C. testified that she must sleep with her sliding door open to get air, even when it is cold, or else she will feel claustrophobic. *Id.*

S.C.’s counsel then questioned S.C. about her medical and psychological history as well. S.C. testified about the betrayal by her previous therapist and her mistrust of medical providers. *Id.* at 152–53. S.C. testified that she began drinking occasionally, starting at the age of twelve, to

self-medicate in response to being molested. *Id.*. S.C. explained she stopped drinking after she learned about the physical effects alcohol had on her liver, because she wanted to preserve her health to be able to take care of her daughter. *Id.* S.C. also testified about cutting a man's throat, stating "it was like something just clicked, I blacked out. And I had him on the floor in my mama's house by the fireplace with a knife to his throat." *Id.* at 154. S.C. testified that she struggles with hyper-vigilance and does not like to be around people because she feels like she must protect herself and her daughter. *Id.* at 155. S.C. also testified that she experiences anxiety-induced insomnia, which had kept her awake since 3 a.m. the night before the hearing. *Id.* at 156. When asked how often she has gone three or four days with no sleep, she replied, "It happens, like this year alone it happened like about eight times." *Id.* When asked by counsel, if she had to go to work every day, would the death anniversaries of her loved one's trigger anxiety that may interrupt her sleep and make her underperform at work, S.C. testified, "Yes. I can barely hold myself together." *Id.* at 157.

**2. Testimony of the Vocational Expert**

Vocational expert Heidi Paul also testified at S.C.'s hearing. Ms. Paul testified that S.C. did not have any past relevant work. *Id.* at 160. The ALJ then presented Ms. Paul with several hypotheticals. *See id.* at 161–63. First, the ALJ asked Ms. Paul if an individual of S.C.'s same age, education, and work experience, who could sit for six hours in an eight-hour day, stand or walk for six, lift or carry fifty pounds occasionally and twenty-five frequently, could frequently use ramps or stairs, balance, stoop, kneel, crouch, or crawl, but never use ladders, ropes, or scaffolds; but who could not be exposed to temperature extremes, fumes, odors, dust, gases, and poor ventilation, with no exposure to unprotected heights or dangerous moving machinery and no driving, would be able to work in the national economy. *Id.* at 161. Ms. Paul testified that the Dictionary of Occupational Titles and companion publications do not specifically address the use of ladders, ropes, scaffolds, ramps, or stairs, nor do they address the amount of exposure one may have with fumes, odors, dust, gases, poor ventilation, extremes in temperature, or working at unprotected heights or near dangerous moving machinery. *Id.* Ms. Paul testified, based on her education, experience, and training as a vocational rehabilitation counselor, that such an individual

could work jobs with medium-level physical expectations, such as floor waxer, hand packager, and hospital food service. *Id.* When the ALJ asked Ms. Paul if her answer would change if the hypothetical individual was limited to simple, routine tasks, Ms. Paul testified it would not. *Id.* at 162. The ALJ expressly declined to ask Ms. Paul questions about Dr. Wiebe's report "because it would be Listing level if it was credited." *Id.*

Next, S.C.'s counsel asked Ms. Paul to take the ALJ's same hypothetical and reconsider her conclusion if the claimant was limited to no interaction with the public and occasional interaction with supervisors. *Id.* Ms. Paul testified that would eliminate the job as a hospital food service worker, but the floor waxer and hand packager jobs would remain the same. *Id.* at 163. Counsel also asked Ms. Paul how her vocational analysis would change if the claimant was frequently or occasionally argumentative with supervisors, but Ms. Paul declined to answer because "[t]hat's not a vocational term. . . . that would be more psychology." *Id.* When counsel asked Ms. Paul what the tolerance for absenteeism and for being off-task would be, Ms. Paul testified that an employee being absent more than one day per month, or off-task more than ten percent of the time per day, would eliminate competitive employment at the unskilled level. *Id.*

### D. The ALJ's Decision and Determination Framework

The ALJ issued her decision denying S.C.'s application for disability benefits on October 15, 2024. *Id.* at 53. The decision followed the five-step process below.

#### 1. The Five-Step Framework

The Social Security Administration uses a five-step process to determine whether claimants are entitled to disability benefits:

> Step 1. Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "*not disabled*" within the meaning of the Social Security Act and is not entitled to disability insurance benefits. If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(b).
>
> Step 2. Is the claimant's impairment severe? If not, then the claimant is "*not disabled*" and is not entitled to disability insurance benefits. If the claimant's impairment is severe, then the claimant's case cannot be resolved at step two and the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(c).

> Step 3. Does the impairment "meet or equal" one of a list of specific impairments described in the regulations? If so, the claimant is "*disabled*" and therefore entitled to disability insurance benefits. If the claimant's impairment neither meets nor equals one of the impairments listed in the regulations, then the claimant's case cannot be resolved at step three and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(d).
>
> Step 4. Is the claimant able to do any work that he or she has done in the past? If so, then the claimant is "*not disabled*" and is not entitled to disability insurance benefits. If the claimant cannot do any work he or she did in the past, then the claimant's case cannot be resolved at step four and the evaluation proceeds to the fifth and final step. See 20 C.F.R. § 404.1520(e).
>
> Step 5. Is the claimant able to do any other work? If not, then the claimant is "*disabled*" and therefore entitled to disability insurance benefits. *See* 20 C.F.R. § 404.1520(f)(1). If the claimant is able to do other work, then the Commissioner must establish that there are a significant number of jobs in the national economy that claimant can do. There are two ways for the Commissioner to meet the burden of showing that there is other work in "significant numbers" in the national economy that claimant can do: (1) by the testimony of a vocational expert, or (2) by reference to the Medical–Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2. If the Commissioner meets this burden, the claimant is "*not disabled*" and therefore not entitled to disability insurance benefits. *See* 20 C.F.R. §§ 404.1520(f), 404.1562. If the Commissioner cannot meet this burden, then the claimant is "*disabled*" and therefore entitled to disability benefits. *See id.*

*Tackett v. Apfel*, 180 F.3d 1094, 1098–99 (9th Cir. 1999) (footnote omitted); *see also Maxwell v. Saul*, 971 F.3d 1128, 1130 n.2 (2020). "At steps one through four, the claimant retains the burden of proof; at step five, the burden shifts to the Commissioner." *Maxwell*, 971 F.3d at 1130 n.2.

At step two, "an impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1522(a). Non-exhaustive examples of "basic work activities" include "[p]hysical function such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling," "[u]nderstanding, carrying out, and remembering simple instructions," "[u]se of judgment," "[r]esponding appropriately to supervision, co-workers and usual work situations," and "[d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1522(b). "[A]n ALJ may find that a claimant lacks a medically severe impairment or combination of impairments only when [that] conclusion is 'clearly established by medical evidence.'" *Webb v. Barnhart*, 433 F.3d 683, 687 (9th Cir. 2005) (quoting Social Security Ruling ("SSR") 85-28).

If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, he does not proceed to the next step. 20 C.F.R. § 404.1520(a)(4).

### 2. The ALJ's Decision

At step one, the ALJ determined that S.C. did not engage in any substantial gainful activity since January 3, 2022, the effective application date. AR at 58. S.C. does not challenge the ALJ's conclusions at step one.

At step two, the ALJ determined that S.C. suffered from the following severe medically determinable impairments: chronic alcoholic gastritis; anemia; major depression; generalized anxiety disorder; and post-traumatic stress disorder. *Id.* She determined that these impairments significantly limited S.C.'s ability to perform basic work activities. *Id.* at 59. The ALJ concluded that S.C.'s seizures and asthma were "non-severe" at step two. The ALJ ruled that S.C.'s seizure disorder was "non-severe" because "[t]he evidence as a whole indicates that [S.C.]'s seizures occur infrequently and they have not more than minimally affected her ability to perform basic work activities since the January 3, 2022 application filing date." *Id.* at 59. The ALJ ruled that S.C.'s asthma was non-severe because "[t]he record confirms that her asthma is generally well managed, as she has not had any exacerbations, emergency department visits, or inpatient care for asthma." *Id.* at 59–60. S.C. challenges the ALJ's findings with respect to epilepsy and asthma at step two.

At step three, the ALJ ruled that S.C.'s impairments did not meet or equal one of the specific impairments listed. ECF No. 11-3 at 59; 20 C.F.R. §§ 404.1520(d), 404.1525, 414.1526, 416.920(d), 416.925, and 416.926. As described above, the ALJ found S.C.'s seizure disorder and asthma non-severe. Still on step three, the ALJ then evaluated the Paragraph B criteria to determine whether S.C. had "an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. *Id.* at 60. The ALJ concluded S.C. did not. *Id.* In reaching this conclusion, the ALJ stated she considered "all of the listed impairments, including section 11.02 (Epilepsy)." *Id.* The ALJ stated this was because "the record does not establish the medical signs, symptoms, laboratory findings or degree of functional limitation required" and "no acceptable medical source designated to make equivalency findings

has concluded that the [S.C.]'s impairment(s) medically equal a listed impairment. *Id.* S.C. challenges the ALJ's Paragraph B criteria with respect to step three.

At step four, the ALJ formulated S.C.'s residual functional capacity (RFC), which is defined as "the most" a claimant "can still do despite [their] limitations." 20 C.F.R. § 416.945(a); *see* AR at 61. The ALJ ruled that S.C. had the capacity to perform less than the full range of medium work, including the ability to:

> lift and/or carry fifty pounds occasionally and twenty five pounds frequently; can stand and/or walk for six hours in an eight-hour workday; can sit for six hours in an eight-hour workday; can frequently climb ramps and stairs; can frequently balance, stoop, kneel, crouch, and crawl; should never climb ladders, ropes, or scaffolds; needs to avoid concentrated exposure to temperature extremes; needs to avoid concentrated exposure to fumes, dusts, gases, and poor ventilation; can have no exposure to unprotected heights, dangerous moving machinery, and driving (due to seizures).

*Id.* at 61–62. The ALJ also ruled that S.C. was mentally competent to perform simple routine tasks. *Id.* at 62. The ALJ concluded that S.C.'s "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms" but that her statements "concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." *Id.* S.C. does not challenge the ALJ's findings at step four of the analysis.

At step five, the ALJ determined that S.C. has no past relevant work. *Id.* at 69. Since the application was filed, S.C. has changed age category from "younger individual" to "closely approaching advanced age." *Id.* S.C. has limited education. *Id.* Transferability of job skills is not an issue because S.C. does not have past relevant work. *Id.* However, the ALJ ruled that, considering S.C.'s age, education, work experience, and residual functional capacity there are jobs that exist in significant numbers in the national economy that S.C. can perform. *Id.* The ALJ concluded that, based on the vocational expert's testimony, S.C. would be able to make "a successful adjustment to other work that exists in significant numbers in the national economy," and thus was not disabled. *Id.* at 70. S.C. does not challenge the ALJ's step five findings.

In formulating her analysis, the ALJ acknowledged—but did not credit—S.C.'s subjective symptom testimony and Dr. Wiebe's psychological evaluation. The ALJ also disregarded Dr.

Ullal's medical opinions, but S.C. does not challenge this specific credibility finding. *Id.* at 66.

## II. STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), a district court has authority to review a Commissioner's decision to deny disability benefits to a claimant. "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Ahearn v. Saul*, 988 F.3d 1111, 1115 (9th Cir. 2021) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)). The district court's role is "to ensure that the [ALJ's] decision was supported by substantial evidence and a correct application of the law." *Ludwig v. Astrue*, 681 F.3d 1047, 1051 (9th Cir. 2012). "'Substantial evidence' means more than a mere scintilla, but less than a preponderance, i.e., such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Robbins v. Social Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006). The Court must "consider the entire record as a whole, 'weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion.'" *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (quoting *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998)). "Where the evidence can reasonably support either affirming or reversing the decision, [the Court] may not substitute [its] judgment for that of the Commissioner." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007).

## III. ANALYSIS

S.C. argues that the ALJ erred in four ways: (1) disregarding S.C.'s subjective symptom testimony, (2) disregarding Dr. Wiebe's psychological evaluation, (3) finding that S.C.'s asthma was not severe, and (4) failing to base the Paragraph B determination on substantial evidence.[4] *See generally* ECF No. 12.

### A. The ALJ Erroneously Rejected S.C.'s Subjective Reporting

S.C. argues that the ALJ erred by disregarding her subjective symptom testimony. The

---

[4] S.C. initially argued that the ALJ also erred by finding that S.C.'s seizures were not severe, but in her reply brief she did not appear to oppose the Commissioner's argument that this issue was moot as the determination only related to step two of the analysis, and the Residual Functioning Capacity report was not materially affected. The Court notes that the RFC imposed limitations of the types of work Plaintiff could do on account of the seizure disorder. AR 61-62.

ALJ disregarded S.C.'s testimony as inconsistent with the objective record, treatment history, and daily activities. For the following reasons, the Court finds the ALJ erred in disregarding S.C.'s subjective symptom testimony.

**1. Legal Standard**

The Ninth Circuit has "established a two-step analysis for determining the extent to which a claimant's symptom testimony must be credited." *Trevizo v. Berryhill,* 871 F.3d 664, 678 (9th Cir. 2017). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* (quoting *Garrison v. Colvin*, 759 F.3d 995, 1014–15 (9th Cir. 2014)). If the claimant meets this requirement and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Garrison*, 759 F.3d at 1014.; *see Lambert v. Saul*, 980 F.3d 1266, 1277 (9th Cir. 2020). "This is not an easy requirement to meet: The clear and convincing standard is the most demanding required in Social Security cases." *Trevizo*, 871 F.3d at 678. To satisfy the "clear and convincing reasons" requirement, "[g]eneral findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015) (quoting *Reddick*, 157 F.3d at 722).

In weighing the claimant's credibility, the ALJ may consider factors including: "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996)). The ALJ may also include observations of treating physicians and "other third parties regarding, among other matters, the nature, onset, duration, and frequency of the claimant's symptom; precipitating and aggravating factors; [and] functional restrictions caused by the symptoms." *Smolen*, 80 F.3d at 128. The ALJ's reasons must be "supported by substantial

evidence in the record." *Thomas v. Barnhart,* 278 F.3d 947, 959 (9th Cir. 2002). An ALJ may not discredit a claimant's subjective symptom testimony "solely because" their symptoms "are not substantiated by objective medical evidence." SSR 96-7p, 1996 WL 374186, at *1.

**2. Analysis**

At step one of this credibility analysis, there is no dispute that the ALJ properly determined S.C. "presented medical evidence of" her underlying impairments "which could reasonably be expected to produce the pain or other symptoms alleged." *Trevizo*, 871 F.3d at 678; *see* AR at 63. Commissioner does not argue, and the ALJ did not find, any evidence of malingering. *See* AR at 63. Thus, the ALJ could only discount S.C.'s testimony regarding the severity of her symptoms "by offering specific, clear and convincing reasons for doing so." *Treviso*, 871 F.3d at 678.

At step two, Commissioner argues that the ALJ properly discounted S.C.'s subjective symptom testimony because it was "not consistent with the medical evidence," "treatment records indicated . . . a strong response to prescribed treatment," and S.C.'s "daily activities contradicted her allegations of limitations." ECF No. 14 at 18. As a threshold matter, Commissioner is incorrect that S.C. only challenges the ALJ's credibility findings with respect to S.C.'s psychological symptoms. *Id.*; *see generally* ECF No. 12. To the extent the ALJ disregarded S.C.'s subjective symptom testimony with respect to her seizure disorder and asthma, the Court will consider whether that subjective medical symptom testimony was erroneously disregarded.

Commissioner first argues that the ALJ properly disregarded S.C.'s subjective symptom testimony because it was inconsistent with objective medical evidence. ECF No. 14 at 19–20. As purported "objective" evidence of S.C.'s inconsistent testimony, Commissioner points to S.C.'s 2024 "TeleMed" examinations by Dr. Hiawatha Harris, M.D. *Id.* At the January 2024 TeleMed visit, Dr. Harris checked boxes indicating S.C. "showed normal speech, a depressed but euthymic mood, congruent affect, intact memory, normal attention, linear though processes, and good insight and judgment." *Id.* At the July 2024 examination, S.C. continued to show normal speech, euthymic mood, cooperative behavior, full orientation, intact memory, normal attention, logical thought processes, and good insight and judgment. *Id.* (citing AR 1409-10). Commissioner further references TeleMed visits in February, March, and July 2024 where S.C. reported that her

condition was "going good," *id.* at 65 (citing *id.* at 1408, 1416), and that her symptoms were "better," *id.* at 65 (citing *id.* at 1412).

S.C.'s TeleMed visits with Dr. Harris are not objective symptom evidence. Nor are they inconsistent with S.C.'s subjective symptom testimony. Commissioner's reliance on the TeleMed visits are unpersuasive to discount S.C.'s subjective symptom testimony. Rather, these visits were largely based on S.C.'s subjective reporting. There is no indication that Dr. Harris conducted any objective testing of S.C.'s symptoms. To the extent Dr. Harris made conclusions about S.C.'s affect based on her presentation of her symptom testimony, S.C.'s ability to cooperate with healthcare providers is not dispositive of the severity of her mental impairments. *See Wranich v. Kijakazi*, 2022 WL 16960900, at *5 (D. Alaska Nov. 16, 2022) ("plaintiff's ability to interact, or cooperate, with medical professionals, especially trained mental health providers, is not the same as having the ability to interact with supervisors, coworkers or members of the general public."). Dr. Harris's TeleMed notes are only indicative that S.C.'s symptoms are sometimes worse and sometimes better, which is consistent with her subjective symptom testimony that her condition worsens around certain stressors. *See, e.g.,* AR at 1412 (voicing concerns in March 2024 that S.C. "was worried about whether her symptoms would increase due to the upcoming anniversary of her daughter's death."); *Garrison*, 759 F.3d at 1017 ("[I]t is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working."). Because Dr. Harris's TeleMed notes are neither objective evidence nor inconsistent with S.C.'s subjective testimony, this was not proper grounds to discredit S.C. symptom testimony.

Next, Commissioner argues that the ALJ reasonably concluded that S.C.'s psychological symptoms were effectively managed by treatment. ECF No. 14 at 20. Notably, Commissioner does not allege that S.C.'s medical conditions—namely, seizure disorder and asthma—are effectively managed by treatment. To start, the cases cited by Commissioner are factually distinct from S.C.'s treatment history. *Wellington v. Berryhill* involved a determination of the claimant's disability onset date; not the credibility of a claimant's symptom testimony. 878 F.3d 867, 876 (9th Cir. 2017). In *Warre v. Comm'r of Soc. Sec. Admin.*, the claimant's medication sufficiently

stimulated his growth for two years and objectively placed him outside the listing level for a growth disorder; it did not involve the credibility of a claimant's symptom testimony. 439 F.3d 1001, 1004–06 (9th Cir. 2005). In *Chaudhry v. Astrue*, the malingering claimant with a somatoform disorder[5] was deemed uncredible because the somatoform disorder was incompatible with depression, the depression symptoms lacked objective support, and the claimant repeatedly failed to seek treatment for depression or follow prescribed courses of treatment. 688 F.3d 661, 671–72 (9th Cir. 2012). Here, there are no assertions that S.C.'s symptoms are malingering, her subjective testimony is consistent throughout the record, and she has not repeatedly failed to seek or follow treatment. Commissioner notes that S.C. was referred to psychiatry in September 2021 but did not begin mental health treatment until January 2024 and that, when she did, her anxiety symptoms responded well to treatment. ECF No. 14 at 20–21. However, S.C. explained at the hearing that she did not seek psychiatric help after the referral because she was busy taking care of her disabled daughter—not because the conditions disappeared. AR at 138. S.C. also testified that she did not trust medical providers because her last therapist betrayed her trust by divulging to S.C.'s mother that S.C.'s stepfather was molesting her. *Id.* at 141, 152. S.C.'s delay in seeking psychiatric treatment after the referral is not clear and convincing evidence for discrediting her symptom testimony altogether.

There is also evidence in the record that S.C.'s treatment thus far has not cured her anxiety. At her July 2024 hearing with the ALJ—after beginning her structured medication regime—S.C. testified that her anxiety "comes and goes" and affects her about five times per month. *Id.* at 145–46. S.C. testified that her anxiety prevents her from driving and affects her even at home, but that she is otherwise "functioning" between incidents. *Id.* S.C. testified that her anxiety symptoms of feeling "hot, tense, and sweaty" last a few hours when they occur. *Id.* S.C. reported that she struggles to remember to take her medications without reminders. *Id.* at 424. Tina Namakian,

[5] A somatoform disorder is "a group of disorders in which physical symptoms suggesting physical disorders for which there are no demonstrable organic findings or known physiologic mechanisms, and for which there is positive evidence, or a strong presumption that the symptoms are linked to psychological factors; e.g., hysteria, conversion disorder, hypochondriasis, pain disorder, somatization disorder, body dysmorphic disorder, and Briquet syndrome." *Somatoform disorder*, Stedman's Medical Dictionary 260650, Westlaw (database updated Nov. 2014).

AMFT opined that S.C. has difficulty attending appointments and consistently engaging with treatment, that S.C. "sometimes does not have the energy to engage in therapy and sometimes forgets appointments," that the intensity, persistence and limiting effects of S.C.'s impairments and symptoms are expected to fluctuate over time, that S.C.'s impairments are not expected to improve significantly, and that S.C. "struggles with managing mental health symptoms." *Id.* at 51. Ms. Namakian also concluded that S.C. would likely miss, on average, four days or more per month as a result of her impairments and/or treatment regime. *Id.* at 50. Thus, S.C.'s treatment history is not a clear and convincing reason to discredit S.C.'s symptom history.

Last, the ALJ ruled that S.C.'s daily activities conflicted with her symptom testimony. ECF No. 14 at 21. As support, the ALJ observed that S.C. was able to do the cooking, cleaning, laundry, dishes, and grocery shopping for her household. AR at 68 (citing AR at 403–10, 422–29, 1044, 1050). The ALJ also observed that S.C. was generally able to attend her treatment and examination appointments. *Id.* at 68 (citing *id.* at 989-1042, 1050, 1057-71, 1127–249, 1316–83, 1408–30). Commissioner cites *Smartt v. Kijakazi* in support but that case, too, is inapposite. 53 F.4th 489 (9th Cir. 2022). In *Smartt*, the claimant's self-report that she routinely drove a car in 2016 undermined her hearing testimony that she had not driven since 2015, and her inconsistent use of mobility aides undermined her testimony that she could not walk without assistance. *Id.* at 498. The *Smartt* claimant's daily activities of cooking, cleaning, childcare, laundry, assisted grocery shopping, playing boardgames, and doing crafts undermined her symptom testimony of "constant '10/10 pain.'" *Id.* at 499–500. "'Only if the level of activity is inconsistent with Claimant's claimed limitations' do daily 'activities have any bearing on Claimant's credibility.'" *Ferguson v. O'Malley*, 95 F.4th 1194 (9th Cir. 2024) (quoting *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). Here, S.C. does not claim that her anxiety is fully debilitating. The fact that S.C. can accomplish basic routine tasks like cooking, doing laundry, and doing dishes is consistent with, and does not undermine, her symptom testimony. *Id.* at 145–46. The fact that S.C. can only shop for groceries while attended and only once per month is certainly consistent with her symptom testimony. The ALJ did not specifically identify how these daily activities contradict S.C.'s symptom testimony and thus did not provide a specific, clear, and convincing reason to

discount S.C.'s symptom testimony.

Thus, because S.C.'s symptom testimony is consistent with the objective record, her treatment history, and her daily activities, the ALJ erred by failing to substantiate a clear and convincing reason for disregarding S.C.'s symptom testimony. On remand, the ALJ is instructed to consider S.C.'s subjective symptom testimony, including the severity of S.C.'s seizures and asthma, and the extent of her psychological impairments with respect to the Paragraph B criteria.

### B. The ALJ Erroneously Rejected Dr. Wiebe's Medical Opinion

The ALJ disregarded Dr. Wiebe's opinion as unpersuasive because the evaluation was performed over telephone, was based on S.C.'s subjective reports, and Dr. Wiebe's objective examination findings did not show marked limitations. *Id.* The ALJ erred here because Dr. Wiebe's opinion is supported by and consistent with the record.

#### 1. Legal Standard

"Under the revised regulations, 'there is not an inherent persuasiveness to evidence from [government consultants] over [a claimant's] own medical source(s), and vice versa.'" *Woods v. Kijakazi*, 32 F.4th 785, 791 (9th Cir. 2022) (quoting Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. at 5844). "'The most important factors' that the agency considers when evaluating the persuasiveness of medical opinions are 'supportability' and 'consistency.'" *Id.* (quoting 20 C.F.R. § 404.1520c(a)). "Supportability means the extent to which a medical source supports the medical opinion by explaining the 'relevant . . . objective medical evidence.'" *Id.* at 791–92 (quoting 20 C.F.R. § 404.1520c(c)(1)). "Consistency means the extent to which a medical opinion is 'consistent . . . with the evidence from other medical sources and nonmedical sources in the claim.'" *Id.* at 792 (quoting 20 C.F.R. § 404.1520c(c)(2). "[A] medical source's relationship with the claimant is still relevant when assessing the persuasiveness of the source's opinion" but "the ALJ no longer needs to make specific findings regarding these relationship factors." *Id.* (citing 20 C.F.R. § 404.1520c(c)(3)). These relationship factors include "the length and purpose of the treatment relationship, the frequency of examinations, the kinds and extent of examinations that the medical source has performed or ordered from specialists, and whether the medical source has examined the claimant or merely

reviewed the claimant's records. *Id.* (citing 20 C.F.R. § 404.1520c(c)(3)(i)–(v)).

**2. Analysis**

Here, because S.C.'s disability claim was filed after the 2017 revised regulations, the ALJ need only articulate findings regarding supportability and consistency with the evidence when determining whether to disregard a medical source. To the extent the ALJ articulated findings about the extent or scope of a particular medical provider's relationship to S.C., this was not required but is relevant. *See Woods*, 32 F.4th at 792 ("[A] medical source's relationship with the claimant is still relevant when assessing the persuasiveness of the source's opinion" but "the ALJ no longer needs to make specific findings regarding these relationship factors"). For the following reasons, the Court finds that the ALJ did not sufficiently articulate her findings with respect to the supportability and consistency of Dr. Wiebe's opinions.

The ALJ found Dr. Wiebe's psychological evaluation unpersuasive overall, as it was inconsistent, in the ALJ's view, with treatment evidence. AR at 67. Dr. Wiebe opined that S.C. has "marked" limitations in terms of understanding, remembering, carrying out detailed instructions, getting along and working with others without excessive irritability, sensitivity, argumentativeness, or suspiciousness, interacting appropriately with the public, and responding appropriately to changes in a routine work setting and dealing with normal work stressors. *Id.* The ALJ found Dr. Wiebe's opinion to be unsupported because the evaluation was conducted over telephone, was based on S.C.'s subjective reports, and Dr. Wiebe's objective examination findings did not show marked limitations. *Id.* The ALJ concluded the "marked" limitations found by Dr. Wiebe were inconsistent with the treatment evidence showing stable mental functioning and few exacerbations. *Id.* at 67 (citing *Id.* at 1409-10, 1413-14, 1417-18, 1427, 1428))

On supportability, the ALJ concluded the telephonic interview lacked the reliability of an in-person interview. *Id.* at 67. The ALJ based this finding on Dr. Wiebe's disclaimer that the evaluation was "limited in scope" because it was "based on one session of client contact and "conducted by telephone." This observation is a relationship finding, not a supportability finding. *Compare* 20 C.F.R. § 404.1520c(c)(1) *to* 20 C.F.R. § 404.1520c(c)(3)(i)–(v). Highlighting the

telephonic nature of the examination and duration of the patient-examiner relationship is not an absence of objective evidence supporting the examiner's ultimate opinion. The ALJ highlighted "the length of the treatment relationship" and "the kinds and extent of examinations and testing that the medical source has performed"—clear relationship factors. 20 C .F.R. § 404.1520c(c)(3). It may be true that a one-off telephonic examination is less persuasive than a long-standing, in-person relationship with a provider, but this does not inherently undermine the supportability of such a telephonic medical opinion. Furthermore, the ALJ did not make a supportability finding with respect to Dr. Hiawatha Harris's "TeleMed" visits, which the ALJ relied heavily on in concluding that S.C.'s anxiety symptoms were improving. Thus, the telephonic nature and brief duration of S.C.'s relationship with Dr. Wiebe is not a properly articulated supportability finding.

Next, the ALJ found that Dr. Wiebe's opinion lacked support because it was based on S.C.'s subjective reporting. But, as Commissioner notes, Dr. Wiebe *did* conduct objective testing (unlike Dr. Harris). ECF No. 14 at 16 ("Dr. Wiebe's ***testing*** showed only mild limitation in attention and concentration and moderate limitation in executive functioning.") (emphasis added). Indeed, Dr. Wiebe administered a comprehensive mix of objective testing and subjective interviewing, listed as "Procedures Administered":

> Clinical Interview
> Barona Estimate
> Montreal Cognitive Assessment (MoCA), telephonic version
> Repeatable Battery for the Assessment of Neuropsychological Status (RBANS)-Form A, selected items: Immediate Memory Index; Semantic fluency task; Digit span task; Story Recall task
> Beck Depression Inventory (BDI-II)
> Beck Anxiety Inventory (BAI)
> Posttraumatic Checklist for DSM-5 (PCL-5)
> Millon Clinical Multiaxial Inventory – IV (MCMI-IV)
> Mental Status/Psychiatric Symptoms Sheet
> Records reviewed, selected records: Internal Medicine Evaluation by Rose Lewis, MD, dated June 6, 2023; Alameda Hospital, Highland Hospital, Alameda Medical Center, Alameda Public Health Services, Alameda Health System, and Eastmont Wellness Center, dated October 2017 to October 2023.

AR at 1390.

In fact, Dr. Wiebe's opinion is supported by perhaps the most objective evidence presented in the administrative record. While the doctor's opinion was informed, at least in-part, by S.C.'s subjective symptom testimony, this does not invalidate the objective nature of certain testing that

was conducted as part of the overall evaluation.

Next, Commissioner argues that Dr. Wiebe's examination notes did not support her opinions. ECF No. 14 at 16. Commissioner disputes Dr. Wiebe's finding that S.C. had an overall "marked" limitation in completing a normal workday and workweek, maintaining regular attendance, and being punctual within customary tolerances, because Dr. Wiebe also found that S.C. had a "mild" impairment in attention and concentration. *Id.* However, attention and concentration were not the only factors Dr. Wiebe considered in determining the "marked" limitation. Rather, the ultimate limitation determinations were holistic, based on S.C.'s entire impairment profile which included subjective and objective elements, and the "moderate to severe impairments of abilities" in the memory domain. AR at 1391. On balance, Dr. Wiebe reasonably concluded that S.C. had a "marked" limitation in competing a normal workday/workweek, maintaining regular attendance, and being punctual. Commissioner also argues that Dr. Wiebe's finding of a "marked" limitation in getting along with others, interacting with the general public, accepting instructions and responding appropriately to criticism was inconsistent with S.C.'s cooperative and responsive behavior during the exam. *Id.* However, as discussed above, the fact that S.C. was cooperative and responsive during the examination is not clear and convincing evidence that Dr. Wiebe's opinions were unsupported. *See Wranich*, 2022 WL 16960900, at *5 (ability to cooperate with medical professionals not indicative of ability to interact in workplace). S.C.'s ability to interact or cooperate with medical professionals is not the same as having the ability to interact with supervisors, coworkers or members of the general public. Thus, the ALJ erred by cherry-picking Dr. Wiebe's evidentiary findings because Dr. Wiebe's overall limitation determinations are supported by her findings at-large.

Finally, with respect to the consistency of Dr. Wiebe's opinions, the ALJ concluded that the "marked" limitations were inconsistent with treatment evidence, as reflected in Dr. Harris's records, showing mental functioning and few exacerbations. ECF No. 14 at 16 (citing AR at 1409–10, 1413–14, 1417–18, 1427, 1428)). These so-called inconsistencies with Dr. Harris's TeleMed visits are based on S.C.'s description of her anxiety symptoms as sometimes better, and sometimes worse. For the reasons discussed above, S.C.'s subjective reporting of her

psychological symptoms to Dr. Harris was otherwise consistent with the record. Furthermore, Dr. Harris's TeleMed visits, like Dr. Wiebe's, were telephonic. However, unlike Dr. Wiebe's examination, Dr. Harris conducted no objective testing. To the extent there is any tension between S.C. subjectively reporting an intact memory and normal attention to Dr. Harris on occasion, this is not inconsistent with Dr. Wiebe's opinions. Upon review, the Court can find no substantial inconsistencies between Dr. Harris's and Dr. Wiebe's opinions.

Thus, because Dr. Wiebe's opinion was supported by objective evidence and consistent with the record, the ALJ erred in disregarding Dr. Wiebe's opinions. On remand, the ALJ is instructed to consider Dr. Wiebe's opinions, including with respect to the Paragraph B criteria.

### C. The ALJ Erroneously Determined that S.C.'s Asthma was Non-Severe

The ALJ ruled that S.C.'s asthma was non-severe. ECF No. 14 at 10–11. The ALJ erroneously discounted S.C.'s description of her asthma severity and failed to provide clear and convincing reasons, supported by substantial evidence, for finding that S.C.'s asthma is not a severe impairment.

#### 1. Legal Standard

"[A]n ALJ may find that a claimant lacks a medically severe impairment or combination of impairments only when [that] conclusion is 'clearly established by medical evidence.'" *Webb v. Barnhart*, 433 F.3d 683, 687 (9th Cir. 2005) (quoting SSR 85-28). "[A]n impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1522(a). Basic work activities means "the abilities and aptitudes necessary to do most jobs" and includes "[u]nderstanding, carrying out, and remembering simple instructions," "[u]se of judgment," "[r]esponding appropriately to supervision, co-workers and usual work situations," and "[d]ealing with changes in a routine work setting." *Id.* at § 404.1522(b).

#### 2. Analysis

The ALJ ruled that S.C.'s asthma was non-severe because S.C. reported in a May 2023 Asthma/Respiratory Impairments Questionnaire that "she did not receive treatment in an emergency room for asthma/COPD/ respiratory problems in the last year, has not been

hospitalized for more than 48 hours for such problems in the past year, and has not had a breathing test/pulmonary function test in the last 12 months." AR at 59. The ALJ reasoned that "[t]he record confirms that her asthma is generally well managed, as she has not had any exacerbations, emergency department visits, or inpatient care for asthma." *Id.* at 59–60. S.C. reported she takes albuterol sulfate daily for her asthma and that it is helpful. *Id.*

The ALJ erred here, too, because hospitalization is not a requirement for a finding that an impairment is severe. The impairment need only "significantly limit" the "ability to do basic work activities." 20 C.F.R. § 404.1522(a). A finding that S.C. "lacks a medically severe impairment" must be "'clearly established by medical evidence.'" *Webb*, 433 F.3d at 687 (quoting Social SSR 85-28). On the contrary, S.C. has pointed to substantial evidence in the record including hearing testimony and a third-party witness statement which, on balance, establish that S.C.'s asthma is severe and has significantly limited her ability to perform "basic work activities" for at least 12 months, despite treatment with medication.

Mr. Reed stated in her third-party function report that, for every five to ten minutes S.C. spends walking, she needs to rest for five minutes before she can resume walking. AR at 401–10. This means that, optimistically, S.C. would need to rest for two hours and forty minutes (out of an eight-hour workday) in a job that requires walking. As vocational expert Ms. Paul testified, being off-task more than 10% of the workday would eliminate competitive employment at the unskilled level. *Id.* at 163. This is hardly "well-managed," even assuming S.C. is consistently taking her albuterol medication.

Commissioner cites *Cruz v. Int'l Collection Corp.* to argue that S.C. has not challenged the ALJ's evaluation of Ms. Reed's statement and therefore waived or forfeited any such argument. See, 673 F.3d 991, 998 (9th Cir. 2012). But S.C.'s opening brief *did* cite to Ms. Reed's report as support for why the ALJ erred. ECF No. 12 at 13–14. Moreover, the ALJ did not even mention Ms. Reed's report when considering whether S.C.'s asthma was severe at step two of the analysis. The ALJ concluded that Ms. Reed's statements are "partially consistent with the record," but that "to the extent that they suggest that the claimant is unable to perform work with the limitations set forth in the [RFC] finding above, they are inconsistent with the evidence of record indicating that

[S.C.] has only intermittent abdominal discomfort, her seizures occur infrequently, and her mental health symptoms cause mild to moderate limitations." AR at 68. This alleged "inconsistency" makes no mention of asthma. Furthermore, the ALJ deployed improper circular reasoning here—a far cry from clear and convincing evidence. The ALJ argues that any of Ms. Reed's statements which are inconsistent with the RFC finding must be disregarded, but the RFC finding was based on a predicate conclusion that disregarded Ms. Reed's severity evidence. This is error.

Thus, the ALJ erroneously discounted S.C.'s description of her asthma and failed to provide clear and convincing reasons, supported by substantial evidence, for finding that S.C.'s asthma is not a severe impairment. On remand, the ALJ shall reconsider the severity of S.C.'s asthma based on the record evidence discussed above, including S.C.'s subjective symptom testimony and Ms. Reed's witness statement.

**D. Remand for Further Proceedings**

Having found that the ALJ committed reversible error, the Court proceeds to determine the appropriate remedy. S.C. argues that remanding for the calculation and award of benefits is appropriate in this case. ECF No. 12 at 28. Commissioner argues that, upon reversal, further proceedings would be necessary to evaluate S.C.'s limitations and "conflicting evidence." The Court finds remand for further proceedings the most appropriate remedy.

**1. Legal Standard**

A district court may "affirm, modify, or reverse a decision by the Commissioner 'with or without remanding the cause for a rehearing.'" *Garrison*, 759 F.3d at 1019 (quoting 42 U.S.C. § 405(g)) (citation modified). "Usually, '[i]f additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded.'" *Id.* (quoting *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981)). "A claimant is not entitled to benefits under the statute unless the claimant is, in fact, disabled, no matter how egregious the ALJ's errors may be". *Strauss v. Comm'r of Soc. Sec.*, 635 F.3d 1135, 1138 (9th Cir. 2011). On the other hand, the court may remand for award of benefits under the "credit as true" rule where: (1) "the ALJ failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion;" (2) "there are [no] outstanding issues that must be resolved before a disability

determination can be made" and "further administrative proceedings would [not] be useful;" and (3) "on the record taken as a whole, there is no doubt as to disability." *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017) (citations and quotations omitted); see also *Garrison*, 759 F.3d at 1021 (holding that a district court abused its discretion in declining to apply the "credit-as-true" rule).

**2. Analysis**

Having found reversible error, the question remains whether there are any outstanding issues to resolve. Commissioner argues that outstanding conflicts remain between the record and the opinions of various providers. ECF No. 14 at 23–24. The Court agrees that further proceedings are warranted to resolve any remaining ambiguities in the record.

Foremost, the ALJ did not consider properly consider S.C.'s subjective symptom testimony (particularly regarding her seizures, asthma, and psychological impairments) or Dr. Wiebe's opinion. Commissioner also points to the Initial Disability Determination Explanation by Dr. Jennings, which noted "insufficient evidence" for a finding on the Paragraph B criteria. AR 167–78. However, the Determination Explanation further noted that S.C. was "distraught" and "[c]ould constitute a suicide risk." *Id.* at 176. Regarding S.C.'s physical abilities, Dr. Jennings found no severe physical impairments. *Id.* at 175. The subsequent Reconsideration Determination Explanation by M. Ford, *id.* at 180–200, indicates that S.C. reported worsening seizures, *id.* at 181, "bad memory," *id.* at 190, and listed a "[s]evere" epilepsy impairment, *id.* at 191.

Dr. Lewis's June 6, 2023 Internal Medicine Evaluation likewise reflected that S.C.'s last seizure was approximately in May 2023. *Id.* at 1044. Dr. Stafford and State agency psychological consultants indicated that Plaintiff's mental impairments did not cause significant limitations. *Id.* at 175–76, 191–92, 1052. However, the ALJ also found Dr. Stafford's opinions only "partially persuasive" for overestimating S.C.'s. ability to perform simple, routine tasks. *Id.* at 66–67. The ALJ determined that S.C. "has not engaged in substantial gainful activity since January 3, 2022, the effective application date," and that determination is not challenged, *id.* at 58, but Commissioner now argues that S.C.'s substantial gainful activity from 2019 to 2021 and her reasons for stopping that work indicate an outstanding conflict. ECF No. 14 at 24. Further proceedings would resolve these issues. Accordingly, the Court will remand for further

United States District Court
Northern District of California

proceedings before an ALJ with the instructions to consider S.C.'s subjective testimony and Dr. Wiebe's opinions.

## IV. CONCLUSION

For the foregoing reasons, Commissioner's decision is reversed and this case is remanded for further proceedings. This may require (but is not limited to) obtaining additional medical records or testimony from S.C. regarding her treatment and symptoms related to her seizure disorder and asthma, and how these conditions affected S.C.'s functioning and ability to work. The Clerk shall enter judgment in favor of S.C. and close the case.

**IT IS SO ORDERED.**

Dated: September 28, 2026

LISA J. CISNEROS
United States Magistrate Judge